## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| STEVE MANIACI<br>*on behalf of himself and*<br>*others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>ORTHOTECH, LLC<br><br>    Defendant.<br>_____ | )<br>)Civil Action No.: 2:25-cv-11138-RJW-APP<br>)<br>)    Hon. Robert J. White<br>)<br>)    Hon. Anthony I. Patti<br>)<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S
### MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)

NOW COMES Plaintiff, Steve Maniaci, by and through his attorneys, and respectfully requests this Honorable Court to enter an order denying Defendant's above-entitled motion for the reasons set forth in the underlying brief.


Dated: October 19, 2025         PLAINTIFF, on behalf of himself
                                and others similarly situated,


                                */s/ Anthony I. Paronich*
                                Anthony I. Paronich
                                Paronich Law, P.C.
                                350 Lincoln Street, Suite 2400
                                Hingham, MA 02043
                                (508) 221-1510
                                anthony@paronichlaw.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| STEVE MANIACI | ) |
| *on behalf of himself and* | )Civil Action No.: 2:25-cv-11138-RJW-APP |
| *others similarly situated*, | ) |
| | )     Hon. Robert J. White |
| Plaintiff, | ) |
| | )     Hon. Anthony I. Patti |
| v. | ) |
| | ) |
| ORTHOTECH, LLC | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.      Whether the Court should deny Defendant's Motion to Dismiss because the Telephone Consumer Protection Act's National Do Not Call Registry provision protects "residential telephone *subscriber[s]*"—not simply *residential telephones*—and the term "residential telephone *subscriber*" encompasses all types of telephone lines and devices (landline and cellular) so long as they are used for personal purposes.

**Suggested Answer**:  Yes.

2.      Whether the Court should deny Defendant's Motion to Dismiss because the TCPA's Do Not Call Registry provision prohibits certain "telephone calls" and "telephone solicitation[s]", which both include text messages.

**Suggested Answer**:  Yes.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY<br>FOR THE RELIEF SOUGHT</u>

*Dobronski v. 1-800-Law-Firm, PLLC*, 2025 U.S. Dist. LEXIS 91963 (E.D. Mich. Apr. 17, 2025)

*Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365 (6th Cir. 2015)

*Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907 (W.D. Mich. 2018)

*Wilson v. MEDVIDI Inc.,* 2025 U.S. Dist. LEXIS 198827 (N.D. Cal. Oct. 7, 2025)

*Wilson v. Skopos Fin., LLC*, No. 6:25-cv-376, 2025 WL 2029274 (D. Or. July 21, 2025)

*Lirones v. Leaf Home Water Sols., LLC*, 2024 WL 4198134 (N.D. Ohio Sept. 16, 2024)

# Table of Contents

**Introduction** ................................................................................................ 1

**Background** .................................................................................................. 2

**ARGUMENT** ............................................................................................... 3

  **I. Text Messages Are "Calls" Under the TCPA, As Nearly Every Court to Consider the Question Has Held, including the Sixth Circuit** ......................... 3

  **a. The Do Not Call List Provisions in TCPA Section 227(c) Authorize the FCC to Prohibit Text Messages** ................................................................... 3

    **i. The Plain Meaning of the Word "Call" Includes Text Messages** .......... 4

    **ii. That Interpretation Aligns Section 227(c)'s Private Right of Action with Its Substantive Provisions** ...................................................................... 8

  **b. Defendant's Attempt to Push a Narrower Interpretation Is Unpersuasive** ...................................................................................................................... 10

  **c. Even If Ambiguity Remained, § 227(c) Is an Express Delegation, and the FCC's Reasoned Rules Merit Judicial Respect** ............................................. 18

  **II. Cellular Telephone Numbers Are Protected Under the TCPA's National Do Not Call Registry Provision** .................................................................... 20

**Conclusion** ................................................................................................. 25

## Table of Authorities

**Cases**

*Abbas v. Selling Source, LLC*, 2009 WL 4884471 (N.D. Ill. 2009) ...................... 18

*Ashland Hosp. Corp. v. Serv. Emps. Int'l Union*, 708 F.3d 737 (6th Cir. 2013) ...... 4

*Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195 (S.D.N.Y. 2024) ..20, 23–25

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ............................................ 6

*Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195 (N.D. Fla. 2025) ............... 11–13

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980) ..................................................... 11

*Dobronski v. 1-800-Law-Firm, PLLC*, 2025 U.S. Dist. LEXIS 91963 (E.D. Mich. Apr. 17, 2025) ....................................................................... 4, 12, 24–25

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) ........................... 24

*Harriel v. Bealls, Inc.*, 2025 WL 2379617 (M.D. Fla. 2025) ................................. 9

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) ....................... 5, 15

*Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) ................... 12

*Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359 (N.D. Ga. Aug. 7, 2025) ...........................................................................................................20, 23–24

*Jackson v. Direct Bldg. Supplies LLC*, 2024 WL 184449 (M.D. Pa. Jan. 17, 2024) ............................................................................................................. 21–22

*Jones v. Blackstone Med. Servs.*, 2025 WL 2042764 (C.D. Ill. 2025) ........... 11–13

*Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365 (6th Cir. 2015) ............... 4–7

*Lirones v. Leaf Home Water Sols., LLC*, 2024 WL 4198134 (N.D. Ohio Sept. 16, 2024) ........................................................................................... 21, 25

*Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999 (N.D. Ill. 2010) …………………………………………………………………………... 5, 11

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..................................... 18

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) ............................................... 23

*Medvidi v. Wilson*, 2025 WL 2856295 (N.D. Cal. 2025) ............................ 9, 11, 15

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012) ......................................... 22

*Nat'l Cable & Telecom Ass'n v. FCC*, 567 F.3d 659 (D.C. Cir. 2009) ................. 12

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) .................................................. 13

*N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288 (2017) .................................................... 24

*Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638 (S.D. Tex. 2023) .............. 8, 10

*Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575 (6th Cir. 2025) ........... 19

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) .................. 5–6

*S. Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) ...................................... 18

*Squillacote v. United States*, 739 F.2d 1208 (7th Cir. 1984) ............................... 12

*VanderSloot v. Charles Baratta LLC*, 2025 WL 1898929 (E.D.N.Y. July 9,2025).23

*Wilson v. Hard Eight Nutrition LLC*, 2025 WL 1784815 (D.Or. June 27,2025)….23

*Wilson v. MEDVIDI Inc.*, 2025 U.S. Dist. LEXIS 198827 (N.D. Cal. Oct. 7, 2025)

…………………………………………………………………………………… 6

*Wisconsin Central Ltd. v. United States*, 585 U.S. 274 (2018) ............................ 11

**Statutes**

47 U.S.C. § 227(a)(2)(A) …................................................................... 22

47 U.S.C. § 227(a)(4) ............................................................................ 10

47 U.S.C. § 227(b)(1)(A)(iii) ............................................................ 5, 15

47 U.S.C. § 227(c)(1), (3), (3)(F), (5) .......................................... 1–3, 10

47 U.S.C. § 227(e)(8)(A)–(B) ......................................................... 17–18

**Regulations**

47 C.F.R. § 64.1200(c)(2), (e) ....................................................... 1–2, 19

47 C.F.R. § 64.2305(d) ................................................................. 22–24

**Other Authorities**

*In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014,

14115 (2003) ................................................................................... 1–2

*In re Targeting and Eliminating Unlawful Text Messages*, 38 FCC Rcd. 12247,

12256–57 (2023) ........................................................................ 1–2, 16

Pub. L. No. 102–243, 105 Stat. 2394 (1991) ...................................... 22

Pub. L. No. 115–141, 132 Stat. 348 (2018) .................................. 17–18

## INTRODUCTION

The Telephone Consumer Protection Act's provisions authorizing a nationwide Do Not Call List, 47 U.S.C. § 227(c), empower the FCC to establish by regulation "a list of telephone numbers of residential subscribers who object to receiving telephone solicitations," *id.* § 227(c)(3), and to prohibit telemarketers from "making or transmitting a telephone solicitation" to phone numbers on that list. *Id.* § 227(c)(3)(F). For decades, the FCC has consistently made those protections available to all residential phone subscribers, regardless of whether their phone numbers are associated with landline phones or cell phones. *See* 47 C.F.R. §§ 64.1200(c)(2), (e); *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14037 ¶¶ 33–36 (2003). The FCC has also determined that those provisions authorize it to prohibit unsolicited text messages, not just voice calls. *See* 47 C.F.R. § 64.1200(e); 18 F.C.C. Rcd. at 14115; *In re Targeting and Eliminating Unlawful Text Messages*, 38 F.C.C. Rcd. 12247, 12256–57 (2023).

In the decades since FCC established the Do Not Call List and began enforcing those protections, over 200 million phone subscribers have come to rely on them. *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203–204 & n.5 (S.D.N.Y. 2024). Plaintiff is one of them. So, when Defendant Orthotech, LLC sent him telemarketing texts in willful violation of the FCC's rules, he brought this

lawsuit to vindicate those rights and put a stop to Orthotech's unwelcome and intrusive marketing practices.

Finally, residential subscribers of cellular telephone numbers are entitled to the protections of the Telephone Consumer Protection Act's National Do Not Call Registry provision under the statute's plain language because the TCPA protects "residential telephone *subscriber[s]*"—not simply *residential telephones*—and the term "residential telephone *subscriber*" encompasses all types of telephone lines and devices (landline and cellular) so long as they are used for personal purposes. The Court can reach this conclusion based on the TCPA's plain text, without deferring to the FCC. And this is the only interpretation consistent with the TCPA's purpose of protecting residential privacy interests.

## BACKGROUND

Section 227(c) authorizes the FCC to create the National Do Not Call Registry and to bar "telephone solicitations" to listed numbers. 47 U.S.C. § 227(c)(1), (3)(F). The FCC's rules prohibit telephone solicitations to numbers on the Registry and expressly apply to calls and text messages to wireless numbers. 47 C.F.R. § 64.1200(c)(2), (e); see also 47 U.S.C. § 227(a)(4) (defining "telephone solicitation" as a "telephone call or message"). Orthotech sent multiple marketing text messages to Maniaci's DNC-registered personal number without consent, more than 31 days after registration. (ECF No. 14.)

2

# ARGUMENT

## I.   Text Messages Are "Calls" Under the TCPA, As Nearly Every Court to Consider the Question Has Held, including the Sixth Circuit.

The text, structure, and purpose of § 227(c), as read by the Sixth Circuit and other courts, foreclose Orthotech's voice-only theory. Orthotech contends that a single use of the word "call" in section 227(c)(5)'s private right of action means that the Do Not Call List rules cannot apply to text messages. That's incorrect.

As courts and the FCC have long and recently recognized, the statute's ordinary meaning, structure, and purpose refute that argument: The word "call" as used in the TCPA refers to any attempt to communicate by telephone, so the FCC may prohibit telemarketing texts to numbers on the Do Not Call List. The context and purpose of the TCPA's Do Not Call List provisions reinforce that interpretation. And Orthotech's arguments for its restrictive interpretation all fail— the company goes about interpreting the word "call" in section 227(c)(5) all wrong, and ends up assigning it a meaning that is at odds with the rest of the statute in multiple ways.

### a.   The Do Not Call List provisions in TCPA Section 227(c) authorize the FCC to prohibit text messages.

#### i.   The plain meaning of the word "call" includes text messages.

The Sixth Circuit has squarely held that a text message constitutes a "call" under the TCPA. *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370–71

(6th Cir. 2015). There, the court explained that "a text message sent to a recipient's cell phone was a 'call' within the meaning of the TCPA," reasoning that the Act's language is broad enough to cover "any attempt to communicate by telephone." *Id.* at 370. Although the Sixth Circuit acknowledged that Congress did not have text messaging in mind when it passed the statute in 1991, the Court found that the word "call" naturally extends to text-based communications made through telephones. *Id.* at 371. That straightforward holding remains binding law within this Circuit and has been repeatedly reaffirmed by district courts applying it to modern forms of telemarketing. See *Dobronski v. 1-800-Law-Firm, PLLC*, 2025 U.S. Dist. LEXIS 91963, at *11 (E.D. Mich. Apr. 17, 2025) ("text-message communications are covered as 'calls' under the TCPA"); *Saunders v. Dyck O'Neal, Inc.,* 319 F. Supp. 3d 907, 911 (W.D. Mich. 2018) ("[t]he scope of the TCPA naturally evolves … with the advent of text messages").

That conclusion follows directly from the statute's text. Section 227(c)(5) authorizes a private right of action for "a person who has received more than one telephone call within any 12-month period … by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Nothing in § 227(c)(5) limits "call" to a voice transmission; at enactment, its ordinary meaning was "to communicate with or try to get into communication with a person by telephone." *Satterfield*, 569 F.3d at 953 *quoting*

4

Webster's Third New International Dictionary (2002)). Nothing about that definition confines "call" to a spoken conversation. A text message—an attempt to reach someone by telephone number—is plainly within that usage.

The broader statutory structure confirms that reading. The word "call" appears throughout the TCPA, and "identical words used in different parts of the same Act are intended to have the same meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). Section 227(b)(1)(A)(iii), for example, makes it unlawful to "make any call … to any telephone number assigned to a … paging service." In 1991, pagers were text-based devices: they received numeric or written messages displayed on a small screen. By using "call" to describe that transmission, Congress necessarily signaled that a "call" could include a written message conveyed over telephone lines. See *Lozano v. Twentieth Century Fox Film Corp.,* 702 F. Supp. 2d 999, 1007 (N.D. Ill. 2010) ("the term 'call' cannot invoke only … oral communication between two parties via telephone"). Thus, even in 1991, "call" comfortably encompassed the sort of data transmission that characterizes modern text messaging.

Supreme Court precedent accords with that understanding. In *Campbell-Ewald Co. v. Gomez,* 577 U.S. 153, 156 (2016), the Court accepted as "undisputed" that "a text message … qualifies as a 'call' within the meaning of the TCPA." The Court's matter-of-fact statement reflects the uniform consensus that

had already developed across circuits, including the Sixth. By the time *Campbell-Ewald* was decided, the understanding that text messages were covered by the Act had become so well established that it was not subject to reasonable dispute.

That interpretation also fits the statute's purpose. Congress enacted § 227(c) to protect "residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Whether a solicitation arrives by voice or by text, the invasion of privacy is the same—the unwanted intrusion into one's personal device and attention. As the Ninth Circuit noted in *Satterfield*, "a voice message or a text message are not distinguishable in terms of being an invasion of privacy." 569 F.3d at 954. Courts applying that principle after Keating have recognized that the harm Congress sought to prevent—unwanted marketing reaching private telephones—occurs equally through SMS. See *Wilson v. Medvidi, Inc.,* 2025 WL 2856295, at *3 (N.D. Cal. 2025) ("Congress was more concerned with the purpose of the communication than the form in which it was transmitted").

Although the Sixth Circuit in *Keating* noted the FCC's 2003 order interpreting "call" to include text messages, it did so only as corroboration of a conclusion compelled by the statute's own text and structure. The Court emphasized that it "unhesitatingly afford[ed] deference" to the agency because the interpretation was consistent with Congress's language—not because deference

6

supplied an otherwise missing rationale. 615 F. App'x at 371. Indeed, the Sixth

Circuit's reasoning was independent: the word "call," as used in § 227, "means to

communicate with or try to get into communication with a person by telephone,"

which naturally encompasses text messaging. *Id. Keating* therefore rests on

statutory interpretation, not on administrative grace. Later decisions in this District,

applying *Keating* after *Loper-Bright*, have continued to treat the inclusion of text

messages as a straightforward application of that binding precedent, not a matter of

deference. See *Dobronski,* 2025 U.S. Dist. LEXIS 91963, at *11 (E.D. Mich.)

("The Sixth Circuit's reasoning stands on its own textual footing.").

Other textual indicators reinforce that conclusion. The statute defines

"telephone solicitation" as "the initiation of a telephone call or message for the

purpose of encouraging the purchase or rental of, or investment in, property,

goods, or services." 47 U.S.C. § 227(a)(4) (emphasis added). That definition

expressly includes "messages," underscoring that Congress sought to capture all

forms of telephonic outreach used for solicitation. A text message is literally a

"message … transmitted to any person" using a telephone, fitting comfortably

within that definition. By reading the neighboring provisions together—"call" in §

227(c)(5) and "call or message" in § 227(a)(4)—the statute's scope plainly extends

to both voice and text solicitations.

Finally, treating text messages as "calls" ensures the statute operates

coherently. Reading "call" narrowly to mean only spoken voice communications would create a mismatch between the private right of action in § 227(c)(5) and the substantive prohibitions in § 227(c)(3), which bar the "making or transmitting [of] a telephone solicitation to the telephone number of any subscriber" on the Do Not Call List. Id. § 227(c)(3)(F). Text messages are undeniably "transmitted" to telephone numbers. It would be illogical for Congress to prohibit the transmission of solicitations to listed numbers but deny those same subscribers a private right of action merely because the solicitation appeared in text form. See *Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. 2023) (rejecting argument that "text messages are not actionable" because it "fails in the face of the statutory text").

In short, the Sixth Circuit's binding precedent, the ordinary meaning of the statutory language, and the uniform consensus of subsequent courts all lead to the same conclusion: a text message sent to a telephone number is a "call" within the meaning of the TCPA. That interpretation requires no administrative deference and no policy embellishment—only the straightforward application of Congress's chosen words. Accordingly, Orthotech's marketing texts to Plaintiff's Do Not Call-registered number fall squarely within § 227(c)'s prohibition and support a claim under the TCPA.

> **ii. That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive**

provisions.

That straightforward understanding of "call" also resolves Orthotech's narrower textual argument. Defendant focuses on the single appearance of the word "call" in § 227(c)(5) and contends that this lone usage limits the private right of action to traditional voice communications. But when the term is read—as it must be—in context with the surrounding provisions of § 227(c), it becomes clear that Congress used "call" consistently with its broader definition elsewhere in the Act.

To see why, start with what is the core of section 227(c)—its prohibition on "making or transmitting a telephone solicitation to the telephone number of any subscriber" on the Do Not Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are communications "ma[de] or transmitt[ed]" to a "telephone number." *Id.* And it is well-established that the residential telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers. The FCC determined that cell phone subscribers are covered when it first created the Do Not Call List rules. *See* 18 FCC Rcd. 14014, 14037–38 ¶¶ 33–36 (2003). And courts have overwhelmingly agreed with that interpretation of the statute ever since. *See, e.g.*, *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. 2025); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).

The statute defines a "telephone solicitation" as "the initiation of a telephone call or message" for commercial purposes. 47 U.S.C. § 227(a)(4). That phrasing alone captures text messages—they are telephonic *messages* transmitted to a number. Courts applying § 227(c) have recognized that Congress focused on the *purpose* of the solicitation, not whether it arrived as a voice or written communication. *Medvidi,* 2025 WL 2856295, at *3. Congress presumably used all that broad and disjunctive language to capture a wide range of potential communication mediums, including text messages. *See Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. 2023) (rejecting an argument that "text messages are not actionable" under section 227(c) because it "fails in the face of the statutory text, which refers to 'telephone call[s] or message[s]'"). The statutory definition of "telephone solicitation" therefore "makes clear that Congress was more concerned with the purpose of the telephone communications … than the form in which those communications are transmitted." *Medvidi*, 2025 WL 2856295, at *3.

### b. Defendant's attempt to push a narrower interpretation is unpersuasive.

Defendant would have this Court interpret the Do Not Call List provisions more narrowly, insisting that the word "call" in section 227(c)(5) can only mean "voice call," and therefore the statute categorically excludes text messages. Its arguments will rely on two recent district court cases, *Jones v. Blackstone Medical*

10

*Services*, 2025 WL 2042764 (C.D. Ill. 2025), and *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195 (N.D. Fla. 2025). But none of the arguments made by Defendant or those cases is persuasive.

Consider first how Defendant reads the word "call" in section 227(c)(5). It repeats a few basic arguments for reading that word as implicitly limited to voice calls. But all of them go about interpreting the statute wrong.

First, Defendant (parroting *Jones*) insists that "call" cannot encompass text messages because text messaging was not an available technology in 1991. *Jones*, 2025 WL 2042764, at *4.

That's not how statutory interpretation works. Of course, text messaging did not exist in 1991, so Congress didn't have it specifically in mind. *See Medvidi*, 2025 WL 2856295, at *2. But it is black-letter law that statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980). Instead, "statutes must be permitted to apply to technologies not in existence when a statute was drafted." *Lozano*, 702 F. Supp. 3d at 1008.

Indeed, "[w]hile every statute's *meaning* is fixed at the time of enactment," it is commonplace that "new *applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). That's why, for example, "a 1925 statute dealing with 'news media' … appl[ies] to television."

11

*Squillacote*, 739 F.2d at 1213. Or why a 1991 law that said "no vehicles in the park" would prohibit Cybertrucks and Priuses, not just Mustangs and Corollas. *See id.* (similar example with Volkswagens).

The same is true here. "In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *2. In other words, the 1991 meaning of the word "call," which "refers to both oral and written communications," is what matters. *Id.*; *see Lozano*, 702 F. Supp. 2d at 1007. And that remains true even if text messages were not the "particular manifestation of [the] problem" that Congress had front of mind at the time. *Nat'l Cable & Telecom Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009); *see Diamond*, 447 U.S. at 315; *Hively*, 853 F.3d at 344–45.

Simply put, this is not a case where the Court needs to "supplant or alter plain language" in order to encompass new technologies. The plain meaning of the statute Congress used in 1991 already covers modern text messages. *See supra*.

Next, Defendant will argue that in modern parlance it sounds odd to refer to a text message as a telephone call. *Jones* and *Davis* also rely on that same intuition—both courts found it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the "analysis begins and ends

12

there." *Davis*, 2025 WL 2491195, at *1. No doubt most people wouldn't use the word "call" the way the TCPA does in casual conversation, especially nowadays. In 2025, text messages are ubiquitous, and society has developed a whole vocabulary around them—think "emoji," "group chat," "read receipt," and so forth. As part of that texting-specific lexicon, we have become very accustomed to saying "text message" or just "text" to describe written messaging between phones.

But statutory interpretation does not turn on modern colloquial usage. If anything, when language has evolved since a statute's enactment, current linguistic intuitions may be affirmatively misleading. For example, in *New Prime, Inc. v. Oliveira*, the Supreme Court explained that the statutory term "contracts of employment" in the Federal Arbitration Act "might call to mind only agreements between employers and employees" today, and thus exclude independent contractors. 586 U.S. 105, 114 (2019). But that "modern intuition" did not match the "evidence of the term's meaning at the time of the Act's adoption," which revealed that "'contract of employment' usually meant nothing more than an agreement to perform work." *Id*. The Supreme Court therefore held that the statutory exception at issue reached not just conventional "employees," as modern parlance might suggest, but also modern independent contractors, as definitions from the time of the statute's enactment suggested. *See id.* at 114–16. In other words, when a mismatch arises between contemporary intuitions and the original

meaning at the time of enactment, it is the latter that controls—not (as Defendant's cases put it) how an "ordinary person would think of a text message" today, *Davis*, 2025 WL 2491195, at *1, or "today's American parlance," *Jones*, 2025 WL 2042764, at *4.

Defendant's interpretation fares no better when it comes to the broader statutory context in which the word "call" in section 227(c)(5) appears.

Defendant barely engages with the substantive Do Not Call List provisions of the statute in the remainder of section 227(c). When it does, it seems to take the position that text messages are neither calls *nor* messages, and thus don't fall within the statutory definition of a "telephone solicitation" at all. That's wrong. *See supra*, Part I.B. Defendant also attacks the broad definition of "telephone solicitation" a different way. Citing *Davis*, the company contends that by inclusively defining a "telephone solicitation" as "the initiation of a telephone call or message" in section 227(a)(4), and then later referring only to a "telephone call" in section 227(c)(5), Congress intended to give section 227(c)(5)'s private right of action a narrower scope than the substantive provisions of section 227(c). Because it's doubtful that Congress intended section 227(c)(5) to have a narrower scope than the Do Not Call List regulations it exists to enforce, the much better reading of "call or message" in section 227(a)(4) is that it instead signals Congress's intent to inclusively define the kinds of "telephone solicitations" that can be prohibited. It

14

simply "makes clear that Congress was more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those communications are transmitted." *Medvidi*, 2025 WL 2856295, at *3.

Nor can Orthotech explain away Congress's contemporaneous use of "call" for text-displaying paging services in § 227(b)(1)(A)(iii). As explained above, the word "call" in that context clearly covers text messages, because it is used to describe a (typically text-focused) transmission to a "paging service." *Id.* § 227(b)(1)(A)(iii); *see supra*, Part I.A. Defendant and the two decisions it cites therefore cannot, and do not, dispute the consensus that the word "call" includes text messages as it is used in the autodialer provisions. Instead, all they can say is that section 227(b) is a "different provision" that could be "arguably broader" than section 227(c). MTD at 2, 7; *see also Jones*, 2025 WL 2042764, at *4–5; *Davis*, 2025 2491195, at *2.

What's missing, however, is any credible reason to think that the word "call" *actually does* mean something broader in section 227(b) than it does in section 227(c). Unless there's a sound reason to think otherwise, a statutory term is presumed to have a consistent meaning throughout a statute. *See Henson*, 582 U.S. at 85. Defendant identifies no reason why the meaning of "call" would differ between the two provisions. Nor does *Jones*. And the only possible distinction *Davis* can muster is to point out that 227(b) says it's unlawful to "to make any

15

call" to various kinds of devices using an autodialer, whereas section 227(c) refers to a prohibited "telephone call" (in section 227(c)(5)'s private right of action) or a telemarketing "telephone call or message" (in the definition of "telephone solicitation" in section 227(a)(4)). But it's not clear why the addition or the subtraction of the modifier "telephone" would have any bearing on the question. Defendant hasn't disputed that a text is a "telephone" communication; of course it is. And whatever work "any" might be doing in section 227(b)(1)(A), *Davis* does not account for similarly broad and inclusive terminology in section 227(c), such as requiring the FCC to "prohibit *any* person from making *or transmitting* a telephone solicitation to the telephone number of *any* subscriber included" in the Do Not Call List. 47 U.S.C. § 227(c)(3)(F) (emphases added); *see supra*, Part I.B.

To the contrary, reading the word "call" differently in section 227(c)(5) than in section 227(b) would make no sense. As the FCC recently explained, it would be "anomalous" to give the word "call" a narrower meaning in section 227(c)(5) than it has elsewhere in the TCPA. 38 FCC Rcd. at 12257 ¶ 27. And, again, Congress would not have *excluded* text messages in section 227(c)(5) by using a term that in section 227(b) *includes* them. *See supra*, Part I.C.2.a. So "there is no reason to believe that ['call'] has a different meaning when used in the do-not-call provisions." *Dawson*, 2024 WL 4765159, at *5.

Finally, Defendant says that an entirely separate provision that was added to

16

the statute in 2018 shows that section 227(c)(5) distinguishes between calls and text messages. Namely, Defendant cites definitions of "caller identification" that were added by the Consolidated Appropriations Act of 2018. Pub. L. No. 115-141, div. P, § 503(a), 132 Stat. 348, 1091 (2018); *see* 47 U.S.C. § 227(e)(8)(A)–(B). Those provisions prohibit false or misleading "caller identification information," defined as information about the source of "a call made using a voice service or a text message sent using a text messaging service." 47 U.S.C. § 227(e)(8)(A). Defendant says that this shows that a "call" and a "text message" are distinct.

But, if anything, section 227(e)(8) actually shows the opposite: It reinforces that texts *are* calls in the lexicon of the TCPA. After all, section 227(e) describes a "text message" as something that is done by a "caller," just like a traditional voice call is. So the more natural takeaway from section 227(e)(8) is that it identifies two different types of calls—voice calls and text messages—both of which originate with a "caller" and therefore require "caller identification." *Id.* Unlike Defendant's interpretation, that reading of section 227(e)(8) accords with the meaning of "call" as that word is used elsewhere in the TCPA. *See supra*, Parts I.A–B.

In any event, even if section 227(e) did distinguish between a "text message" and a "call" as Defendant contends, that would not change the best reading of section 227(c). When Congress enacted section 227(e)'s caller identification rules in 2018, Congress directed that nothing therein "shall be construed to modify,

17

limit, or otherwise affect any rule or order adopted by the [FCC] in connection with [the TCPA]." Pub. L. No. 115–141, 105 Stat. 348, § 503. That would include the FCC rules and orders that interpreted "call" to include text messages.

Moreover, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *S. Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 355 (1998); *see also Abbas*, 2009 WL 4884471, at *5 ("Subsequent legislation provides at best an uncertain indicator of previous congressional intent … ."). Surely, that's especially true here, where the Congress that enacted section 227(c) and the Congress that enacted section 227(e)(8) legislated on opposite ends of a seismic shift in phone technology. The more meaningful comparison is to the meaning of "call" in section 227(b), which was enacted at the same time as section 227(c), and which clearly uses "call" to refer to written messages.

### c. Even if ambiguity remained, § 227(c) is an express delegation, and the FCC's reasoned rules merit judicial respect.

*Chevron's* blanket deference is gone, but *Loper Bright* reaffirmed that courts still respect agency judgments where Congress expressly delegates authority to fill out a statutory scheme or to regulate within capacious terms like "effective," "efficient," or "appropriate," so long as the agency acts within those bounds and with reasoned explanation. 603 U.S. 369, 395 (2024).

Section 227(c) is just such a delegation: Congress directed the FCC to adopt the "most effective and efficient" rules to protect residential privacy and to weigh

"advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A), (E). The Commission then—consistently, for decades—treated text messages as "calls" and applied the DNC protections to wireless numbers. 47 C.F.R. §§ 64.1200(c)(2), (e).

Post-*Loper Bright*, the Sixth Circuit has recognized that where Congress delegates in this manner, courts "fix the boundaries and police reasoned decisionmaking," not replace the agency's policy judgments. *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587–88 (6th Cir. 2025). The FCC's rules easily clear that bar: they implement the statute's privacy purpose, track its text ("call or message"), and promote uniform consumer expectations that have governed the DNC regime for years.

## II. Cellular Telephone Numbers are Protected under the TCPA's National Do Not Call Registry Provision

Section 227(c) protects residential subscribers, not a hardware type. In context, "residential" distinguishes personal use from business use; "telephone subscriber" covers wired or wireless service. 47 U.S.C. § 227(c)(1); *Cacho*, 739 F. Supp. 3d at 206. The Court should conclude that an individual residential subscriber to a cellular telephone service is a "residential" subscriber protected by the statute. As explained above, "solicitations" to a cell phone fit the definition of a "telephone call or message" that is "transmitted" to any person. The statute does not require transmission by wire, or any type of technology for that matter. Next,

consider who is protected: "residential telephone subscribers" or, elsewhere, just "residential subscribers." 47 U.S.C. §§ 227(c)(1), (c)(3). Unpacking that language yields the same conclusion. In context, the ordinary meaning of § 227(c)'s text here establishes that Congress authorized the FCC to protect *all* "residential telephone subscribers," including cell phone subscribers. 47 U.S.C. § 227(c)(1). For starters, a "subscriber" is anyone who gets a bill in exchange for service. *See Cacho*, 739 F. Supp. 3d at 206. So, a person can be a "telephone subscriber" to any telephone service, either wired or wireless. *Id.*; *Wilson v. Hard Eight Nutrition LLC*, No 6:25-cv-144, 2025 WL 1784815, at *5 (D. Or. June 27, 2025). That leaves the word "residential," which Defendant's argument hinges on. But that word doesn't exclude cell phone subscribers, either.

As used in the TCPA, "residential" is just the opposite of "business," not "landline" from "wireless." *See, e.g.*, *Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359 (N.D. Ga. Aug. 7, 2025). So, the word "residential" in § 227(c) distinguishes types of subscribers and refers to the *purposes* for which a phone is used, not its technology, physical characteristics, or location. *Wilson,* 2025 WL 1784815, at *5; *Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-cv-1569, 2024 WL 184449, at *5-7 (M.D. Pa. Jan. 17, 2024). And "residential subscriber" means a subscriber who uses their phone "for personal activities associated with his or her private, domestic life." *Cacho*, 739 F. Supp. 3d at 206; *accord Isaacs*, 2025 WL

2268359, at *3; *Wilson*, 2025 WL 1784815, at *5; *Lirones v. Leaf Home Water Sols., LLC*, No. 5:23-CV-2087, 2024 WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024). Many cell phone subscribers, including Plaintiff, fit that description.

And, as *Jackson* explained, 2024 WL 184449, at *5, Defendant's argument commits a fundamental grammatical error, which also explains why Plaintiff's reading doesn't "conflate" "residential" and "cellular" "telephones," because the adjectives *don't even modify the word "telephone"*:

> The best reading of the word "residential" is not that it modifies the "telephone," but rather that "residential" and "telephone" both modify the "subscriber." So instead of describing a "subscriber" who owns a "residential telephone," Section 227(c)(1) describes a "telephone subscriber" who has subscribed for "residential," i.e., personal, purposes. "Residential" is therefore used in the broader sense of "relating to a resident" to distinguish such a subscriber from a business or commercial telephone subscriber, who cannot be added to the Do Not Call registry.

The TCPA's text and FCC regulations establish that meaning of the word "residential," and nothing about that meaning is contrasted with the word "cellular." Rather, it is contrasted with the word "business." Congress used the word "residential" in the TCPA's statutory findings in *this* manner, and not in the manner that Defendant proposes. For example, Congress noted that "businesses actively telemarket goods and services to *business and residential* customers." Pub. L. No. 102–243, 105 Stat. 2394, § 2 (emphasis added). The current text of the TCPA, as amended in 2005, also contrasts "residential subscriber" with "business subscriber." 47 U.S.C. § 227(a)(2)(A). And FCC statutory regulations dating back

to the 1990s explicitly define "residential subscriber" to mean "a subscriber ... *that is not a business subscriber*." 47 C.F.R. § 64.2305(d) (emphasis added); *see* 14 F.C.C. Rcd. 15550, 15692 (1999). Defendant's reliance on *Insurance Marketing Coalition* is misplaced.

That meaning of "residential" also aligns with the "express aim" of the Do Not Call List: to protect residential subscribers' ""privacy rights."" *Wilson*, 2025 WL 1784815, at *6 (quoting 47 U.S.C. § 227(c)(1), (2)). That shows that "Congress's interest in Section 227(c) was in the person and province that was being invaded and not simply in the technology through which the invasion was effected." *Cacho*, 739 F. Supp. 3d at 207. Those interests "do not depend upon whether the undesired telephone solicitations are received on a cellular phone rather than a landline." *Lyman*, 2024 WL 3406992, at *4.

This reading also aligns with the purpose and structure of the TCPA as a whole as protecting privacy rights for cell phone subscribers receiving text messages. In passing the statute, Congress expressly found that "[u]nrestricted telemarketing ... can be an intrusive invasion of privacy." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (quoting Congressional findings). The statute as whole responds to those findings by providing protection from noxious telemarketing practices across a wide range of devices and telephonic communication mediums that receive "messages." So, Congress clearly did not

understand "privacy rights" to be the exclusive province of landline phone subscribers receiving voice calls.

Defendant's "landline-location" reading fails grammatically and contextually. The statute protects a *subscriber*—a person who uses a number for personal, residential purposes—not a physical wire in a house. In support of its proposition that a "residential subscriber" means a "subscriber to a copper landline," Defendant points out that, in a different part of the TCPA, in restrictions on autodialer and robocall technology in § 227(b), the statute uses the words "cellular telephone service," while § 227(c) does not have similar language. "The force of any negative implication, however, depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). Here, context refutes Defendant's negative inference, because § 227(b) and § 227(c) have a "markedly different scope and structure." *Wilson*, 2025 WL 1784815, at *4; *VanderSloot v. Charles Baratta LLC*, No. 24-cv-7096, 2025 WL 1898929, at *4 (E.D.N.Y. July 9, 2025). Section 227(b) identifies intrusive telemarketing practices based on the *technologies* involved, while § 227(c) focuses on protecting identified *people* from unwanted solicitations. *See Wilson*, 2025 WL 1784815, at *4; *Isaacs*, 2025 WL 2268359, at *3 (N.D. Ga. Aug. 7, 2025). That's an obvious reason why "cellular telephones" would be expressly mentioned as a specific technology protected in in § 227(b), a section regulating technology, but not § 227(c), which deals with

consumer privacy. *Dobronski*, 773 F. Supp. 3d at 376. Section 227(c) protects the

subscriber, not a hardware type: it bars telephone solicitations to the number of a

residential (non-business) subscriber. *See* 47 U.S.C. § 227(c)(3)(F); 47 C.F.R. §

64.2305(d).

Nor do Defendant's reliance on historical context and dictionaries dictate a

contrary result. All that Defendant's historical sources show is the obvious fact that

most residential subscribers still had landlines in 1991. But even if that's true, that

doesn't mean Congress intended anything to turn on the presence or absence of a

physical wire. *See Cacho*, 739 F. Supp. 3d at 205. And even history is no match for

"a careful examination of the ordinary meaning and structure of the law itself."

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). As outlined

above, that examination shows that Congress authorized the FCC to protect cell

phones, so there's no need to resort to legislative history, including the legislative

history that underpinned the dissent in *Chennette*. All the *Chennette* dissent adds

are a few comments from individual Senators and a legislative analyst. This hardly

shows that Congress intended to protect only physical wires connected to a house,

nor is it particularly illuminating, for "floor statements by individual legislators

rank among the least illuminating forms of legislative history." *N.L.R.B. v. SW

Gen., Inc.*, 580 U.S. 288, 307 (2017).

Here, context establishes that "Congress used the term 'residential' in the

24

broader sense of 'relating to a resident' to distinguish such a subscriber from a business or commercial telephone subscriber." *Cacho*, 739 F. Supp. 3d at 206. Finally, if imposed on the statute today, a landline-only interpretation would have disruptive consequences. Notably, the existing Do Not Call List database contains hundreds of millions of numbers, with no way to tell which are cell phones. *Cacho*, 739 F. Supp. 3d at 203–04 & n.5. So Defendant's interpretation would likely require "jettisoning the existing database to start anew," upending protection for millions, including landline subscribers who indisputably belong on the list. *Id*.

## Conclusion

Orthotech's motion asks this Court to carve text messages and cell-phone users out of the TCPA's do-not-call protections. The statute says otherwise. In this Circuit, a text message sent to a telephone number is a "call," and § 227(c) protects residential subscribers—i.e., people who use a number for personal, non-business purposes—regardless of whether the device is a landline or a cell phone. See *Keating*, 615 F. App'x at 370–71; *Dobronski*, 2025 U.S. Dist. LEXIS 91963, at *11. Plaintiff alleges multiple unsolicited marketing texts to his DNC-registered personal number in violation of the FCC's rules. Those allegations state a claim under § 227(c). The motion to dismiss should be denied.

25

Dated: October 19, 2025          PLAINTIFF, on behalf of himself
                                 and others similarly situated,


                                 */s/ Anthony I. Paronich*
                                 Anthony I. Paronich
                                 Paronich Law, P.C.
                                 350 Lincoln Street, Suite 2400
                                 Hingham, MA 02043
                                 (508) 221-1510
                                 anthony@paronichlaw.com